J-S07001-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| P.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| A.C. AND D.H. | : | No. 947 WDA 2020 |

Appeal from the Order Entered August 21, 2020
In the Court of Common Pleas of Butler County Civil Division at No(s):
F.C. #20-90275-C

BEFORE:  SHOGAN, J., DUBOW, J., and KING, J.

MEMORANDUM BY SHOGAN, J.:                **FILED:  April 23, 2021**

Appellant, P.G., appeals from the August 21, 2020 order granting the preliminary objections of A.C. ("Mother") and finding that P.G. lacks *in-loco-parentis* standing to pursue custody of Mother's daughter, H.C. ("Child"), born in January of 2016.  After careful review, we affirm.

Child is the daughter of Mother and D.H., who did not participate in this proceeding.  N.T., 7/28/20, at 18–19.  P.G. and Mother were friends, who engaged in one or two sexual encounters in 2013 or 2014, but they never were in a prolonged romantic relationship.  *Id.* at 9, 24–25, 48-49.  Following Child's birth in January 2016, Mother stayed home and cared for Child until October 2016.  *Id.* at 8-12, 72.  Mother returned to work and obtained a position as a certified nurse's assistant.  *Id.* at 8–12.  Mother and Child lived alone at the time, and Mother's grandmother cared for Child while Mother

worked.[1]  *Id.* at 9.  When Mother's grandmother died in March of 2017, P.G. offered to care for Child, and Mother accepted P.G.'s assistance.  *Id.* at 12–13, 72–74.  P.G. cared for Child regularly over the next several years, including at least two or three overnight periods each week.  *Id.* at 13–14, 21, 34–40.  This arrangement finally ended in February 2020.  *Id.* at 21.

The dispute at the heart of this appeal relates to how much time P.G. spent with Child during these years and P.G.'s status in Child's life.  On May 18, 2020, P.G. filed a complaint requesting shared legal and physical custody. He averred that he stood *in loco parentis* with respect to Child, as he had exercised an extensive caretaking schedule and provided for her medical, emotional, and financial needs.  P.G. also filed an emergency petition for special relief on May 21, 2020, requesting an interim custody order pending conciliation and raising concerns regarding Child's safety.  He averred that Mother was in a relationship with a J.K., and that a temporary Protection from Abuse ("PFA") order recently had been entered against J.K., relating to his own children as protected parties.  Mother filed preliminary objections on June 5, 2020, challenging P.G.'s standing to pursue custody, averring that P.G. merely was a childcare provider.

---

[1]  Mother also had an eight-year-old son, who resided with Mother's parents. N.T., 7/28/20, at 9.  That child is not involved in this case.

The trial court held a hearing, at which Mother and P.G. testified, on July 28, 2020.[2] Mother testified that her usual work shift is from 3:00 p.m. to 11:00 p.m. five days per week, but that she also began working double shifts during the first year at her new job, from 3:00 p.m. to 7:00 a.m. two to three nights per week. N.T., 7/28/20, at 11–15. Mother explained that P.G. usually cared for Child during these two-to-three-overnight periods each week and acknowledged that P.G. "[s]ometime[]" cared for Child at other times as well. *Id.* at 13–14, 17, 34–40. Mother also acknowledged that Child would remain in P.G.'s care after Mother's double shifts so she could go home and sleep before returning to work again. *Id.* at 16. Although Mother stopped working double shifts in the spring or summer of 2019, she indicated that P.G. continued to spend the same amount of time caring for Child until February 2020. *Id.* at 14–15, 21. Mother did not dispute that P.G. and Child shared a bond. *Id.* at 25, 42 ("There would be a bond, correct. . . . She doesn't bring his name up as often as she did before. I'm sure she does [miss P.G.]"). *Id.* at 42.

Regarding the amount of responsibility P.G. had while caring for Child, Mother testified that P.G. contributed to Child's care by buying formula and

---

[2] The purpose of the hearing was nominally to address Mother's preliminary objections and P.G.'s emergency petition for special relief, but the trial court addressed only the merits of Mother's preliminary objections, reasoning that P.G.'s emergency petition for specific relief would be moot if P.G. lacked standing. N.T., 7/28/20, at 3, 86–87.

diapers "here and there." N.T., 7/28/20, at 43–44. Mother stated that she offered P.G. money for childcare services, but he declined. *Id.* at 16. Mother explained that she does not drive, and P.G. assisted her with transportation as well as childcare. *Id.* at 10, 43. Mother averred that she provided P.G. with cash or her debit card to cover transportation expenses. *Id.* at 16, 44–46. Mother also explained that she filed releases so that P.G. could take Child to the doctor or the hospital in case of an emergency. *Id.* at 17. Mother stated that P.G. was to keep her informed of any situation that arose, and Mother retained decision-making authority in an emergency. *Id.* at 18. In addition, Mother agreed that P.G. took Child to doctors' appointments when she was working. *Id.* at 41.

In contrast, P.G. testified that he spent extensive periods caring for Child, even having her in his care for nearly two weeks during the summer of 2018. N.T., 7/28/20, at 54. P.G. presented text messages, which his counsel used to cross–examine Mother, in support of this claim. The text messages revealed that Mother asked P.G. to care for Child even when she was not working, because she was having a bad day, wanted to spend time with her friends, or myriad other reasons. *Id.* at 34–40. In one message sent in June 2019, Mother demanded that P.G. retrieve Child at 5:15 a.m., stating, "You need to come get [Child]. . . . No. Come get her. You said to call if I need anything. You need to come get her. Come get [Child]." *Id.* at 34. In

another message sent in February 2019, Mother demanded that P.G. "come get this f–ing kid right now. She is nonstop screaming." *Id.* at 39.[3]

P.G. also endeavored to present himself as exercising a greater degree of responsibility for Child than Mother had suggested. P.G. testified that he was at the hospital at Mother's request when Child was born and assisted with Child's care from the very beginning. N.T., 7/28/20, at 49, 70–71. He maintained that he provided occasional support for Child by purchasing formula and diapers even before he began caring for her overnight. *Id.* at 49–50. P.G. stated that he did not recall whether Mother offered to pay him for childcare services, but he would have declined if she had. *Id.* at 57–58, 66–67. He conceded that Mother provided him with her debit card "a couple times . . . where she would need me to pick something up or pay some bill for her." *Id.* at 50.

Although the parties disagreed regarding the extent of P.G.'s involvement in Child's life, they agreed that P.G.'s caretaking role ceased due to Mother's relationship with J.K. Mother testified that she began dating J.K. in April 2019 and moved into J.K.'s apartment in September or October 2019, although he was not living there at the time because he was incarcerated. N.T., 7/28/20, at 19–22, 43. Mother suggested that J.K. was released in

---

[3] It appears the trial court admitted the text messages into evidence. N.T., 7/28/20, at 87–89. However, they do not appear in the record certified to us on appeal.

January 2020, and P.G. became upset because J.K. was spending more time with Child than he was. *Id.* at 22. Mother testified that she offered P.G. three days per week with Child, but P.G. declined. *Id.* at 22–23. Mother maintained that P.G. appeared hostile to Child developing a bond with any of the men she dated.[4] *Id.* at 23.

P.G. testified that he did not decline Mother's offer of three days per week with Child; rather, he claimed they never concluded their discussion on the matter. N.T., 7/28/20, at 57–59, 64, 83–84. P.G. acknowledged that he became upset when other men entered Child's life but insisted it was because Mother dated men of questionable character and brought Child into their presence. *Id.* at 51. On cross–examination, Mother's counsel pressed P.G. about whether he had romantic feelings for Mother, and P.G. contended that he loved Mother "as a friend, as family." *Id.* at 65–66.

Following the hearing, the trial court entered the order on appeal on August 21, 2020, concluding that P.G. did not possess *in-loco-parentis* standing with respect to Child. The order sustained Mother's preliminary objections and denied P.G.'s emergency petition for special relief. P.G. timely filed a notice of appeal on September 11, 2020, along with a concise statement of errors complained of on appeal.

P.G. now presents the following claims for our review:

---

[4] Mother stated that she and J.K. broke up in May or June 2020 and last spoke in June or July 2020. N.T., 7/28/20, at 19, 45.

1. The Trial Court committed an abuse of discretion or error of law in finding that [Appellant], P.G., lacked *in loco parentis* standing based upon the frequent, continuing contact that he had with the minor child, which was, at the least, encouraged and supported by Mother and at times, even demanded by Mother.

2. The Trial Court committed an abuse of discretion or error of law in finding that [Appellant], P.G., lacked *in loco parentis* standing when Mother discharged her parental duties when [Child was] with [P.G.], not only when she was working, but also when it was convenient for Mother's sleeping schedule or social activities.

3. The Trial Court committed an abuse of discretion or error of law in not considering the best interests of the child in making its determination.

P.G.'s Brief at 4.

"'Threshold issues of standing are questions of law; thus, our standard of review is *de novo* and our scope of review is plenary.'" ***K.W. v. S.L.***, 157 A.3d 498, 504 (Pa. Super. 2017) (quoting ***Rellick–Smith v. Rellick***, 147 A.3d 897, 901 (Pa. Super. 2016)). Further:

> Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

***Shafer Electric & Construction v. Mantia***, 67 A.3d 8, 10–11 (Pa. Super. 2013).

P.G.'s claims are interrelated. In all three of his issues, P.G. challenges the trial court's conclusion that he lacks *in-loco-parentis* standing to pursue custody of Child. P.G. contends that he cared for Child frequently and effectively co-parented Child. P.G.'s Brief at 13–16. He argues that Mother consented, and sometimes demanded, his significant role in Child's life, and he directs our attention to her text messages discussed *supra*. **Id.** Finally, P.G. asserts that the trial court improperly failed to consider Child's best interests when rendering its decision. **Id.** at 16–18. He emphasizes that he shares a bond with Child, which supports the conclusion that he stands *in loco parentis*. **Id.**

Our child custody statute provides for only limited circumstances under which an individual other than a parent may pursue custody of a child. 23 Pa.C.S. §§ 5324–5325. At issue instantly is Section 5324(2), which grants standing to pursue any form of legal or physical custody to "[a] person who stands in loco parentis to the child." 23 Pa.C.S. § 5324(2). This Court has explained *in loco parentis* standing as follows:

> "The term *in loco parentis* literally means 'in the place of a parent.'" **Peters v. Costello**, 586 Pa. 102, 891 A.2d 705, 710 (2005) (citing Black's Law Dictionary, 791 (7th Ed. 1991)). A person stands *in loco parentis* with respect to a child when he or she assumes the obligations incident to the parental relationship without going through the formality of a legal adoption. The status of *in loco parentis* embodies two ideas; first, the assumption of a parental status, and second, the discharge of parental duties. . . . [I]n loco parentis status cannot be achieved without the consent and knowledge of, and in disregard of, the wishes of a parent.

***K.W.***, 157 A.3d at 504–505 (some citations and quotation marks omitted).

There is no clear line of demarcation when an individual has attained *in-loco-parentis* status. As this Court explained, "Whether or not such status exists is a 'question of fact to be determined by an evaluation of all of the circumstances, rather than a matter of strict legal definition.'" ***Drawbaugh v. Drawbaugh***, 647 A.2d 240, 241 (Pa. Super. 1994). Review of the relevant case law reveals that our courts have found *in-loco-parentis* standing most often when the person seeking custody is a former stepparent or romantic partner. ***See***, ***e.g.***, ***T.B. v. L.R.M.***, 786 A.2d 913, 920 (Pa. 2001) (holding that the mother's former partner stood *in loco parentis*, where the partner "established that she assumed a parental status and discharged parental duties with the consent of [the mother]"). Our courts have also found *in-loco-parentis* standing when the person seeking custody has acted as the child's primary or sole caregiver because of the incapacity or absence of the parents. ***See***, ***e.g.***, ***Peters***, 891 A.2d at 706–714 (observing it was undisputed that the appellees stood *in loco parentis* to a now-adult child, where the child's mother died, and the father placed the child in their care, thus holding that the appellees were the "grandparents" of the child's daughter and could pursue custody based on their *in-loco-parentis* status).

Our research, however, has not uncovered a published opinion granting *in-loco-parentis* status to a part-time caregiver, even when that caregiver has provided a parent with significant assistance. To the contrary, our courts have

rejected requests for *in-loco-parentis* standing on that basis. For example, in *Argenio v. Fenton*, 703 A.2d 1042 (Pa. Super. 1997), this Court considered the case of a grandmother who sought *in-loco-parentis* standing with respect to her deceased daughter's child. The grandmother contended that she had "cared for the child on a daily basis, both in the presence and the absence of her daughter. . . . while her daughter attended school and/or was away from the child for general purposes." *Id.* at 1043–1044. We affirmed the trial court's decision that the grandmother lacked standing, agreeing that her role in the child's life was that of a babysitter or frequent caretaker. *Id.* at 1044. We also agreed with the trial court's characterization of the daughter's actions as "appropriate and . . . consistent with that which would be expected of a young, unwed mother who was trying to obtain an education, be productive, and continue to develop socially." *Id.*

We reached a similar result in *Morgan v. Weiser*, 923 A.2d 1183 (Pa. Super. 2007). *Morgan* involved a biological father whose parental rights had been terminated. The father filed for custody, claiming *in-loco-parentis* standing based on his relationship with the child, which he allegedly maintained with the adoptive parents' permission. *Id.* at 1186–1189. The trial court found that the father lacked standing, and this Court affirmed. We explained that the father never lived with the child in a familial setting, that he generally saw her for only a few hours each week, and that the time he spent with her "equated [to] time as a babysitter or caretaker." *Id.* at 1188.

We added that the child did not refer to the father as "Dad," and that the father never discharged parental duties. *Id.* at 1188–1189. While the father had unsupervised time with the child, he did not support her financially or provide input regarding her development. *Id.*

Turning to the merits of this appeal, the trial court discussed both *Argenio* and *Morgan* in its opinion and reasoned as follows, in relevant part:

M]uch like the maternal grandmother in *Argenio*, [P.G.] provided frequent child care for [Child] and helped Mother during work hours and when she needed help running errands or developing a social life, those things "which would be expected of a young, unwed mother who was trying to obtain an education, be productive, and continue to develop socially." *Argenio*, 703 A.2d at 1044. [P.G.'s] argument that this case does not apply or that, in the alternative, if it did apply[,] he would still have standing[] because Mother would only be working some of the time that he was babysitting, . . . she would also text him other times to come and get [Child] when she wanted to sleep, was feeling overwhelmed, or wanted to be left alone[,] is unpersuasive. It does not paint the picture of Mother that [P.G.] intends. Rather, it shows a young mother who knows her limits and understands when to ask for help. Asking for help does not equate [to] a discharge of parental duties. There was no evidence on the record that Mother lacked parenting abilities in any way. Rather, she thought she had a support system in her friend, and [a] reliable child care provider, someone that is necessary to a single working mother, only to have that support system ripped out from under her when [P.G.] did not like the way in which Mother was living her life, namely that she was living with a man that was not him.[5]

_____

[5] We note that there was some indication in the testimony that J.K. actually did pose a threat of harm to Child, and that P.G.'s concerns as to Child's safety were valid. During the hearing, P.G.'s counsel asked Mother about a text message that she sent to P.G., describing an incident during which J.K. knocked Mother unconscious with a table. N.T., 7/28/20, at 31 ("He took [Child's] wooden table . . . and whaled it at my head. So I was trying to run from him, got knocked out, and woke up to being carried with blood dripping

- 11 -

There was simply no evidence to indicate that she viewed [P.G.] as anything but a babysitter for [Child.] She offered him money, kept a set schedule but would ask if he wanted additional shifts, left spending money for [Child] by way of a debit card while she was with [P.G.], and made arrangements so that [Child] could receive medical attention if needed while with [P.G.] without handing over medical decision making. These are all normal actions taken between parents and babysitters. [P.G.] was temporarily entrusted with the responsibility of ensuring [Child's] safety and caring for her needs (*i.e.*, ensuring her welfare) in Mother's absence. [P.G.] did not financially provide for [Child] beyond providing some food and diapers on [a] few occasions, certainly nothing rising to the level of parental duties.

The frequent and continuing contact that [P.G.] had with [Child] that was encouraged and supported by Mother, was that of a child and her babysitter. Like **Morgan**, Mother never permitted [P.G.] to assume parental status during this time, nor did [P.G.] discharge any parental duties. **See Morgan**, 923 A.2d at 1189. [P.G.] also fails in his argument that Mother discharged her parental duties when [Child] was with [P.G.] for times other than when Mother was working. Again, [P.G.] failed to prove that, even in the time he had [Child] when Mother was not working, . . . he had assumed any parental status or discharged any parental duties. Thus, any reasons as to why [P.G.] was babysitting [Child] is irrelevant to standing in a custody action. Importantly, it should be noted that [P.G.] is asking for something that even a biological grandparent would not have the legal rights to obtain. The rights of the family do not give way to the attachment of a babysitter, especially in light of a total lack of evidence that [Child] has been harmed in any way by not having contact with [P.G.] in months. Granting [P.G.] standing would lead to an absurd result. As such, [P.G.'s] . . . argument that the [c]ourt failed to consider the best interest of the child in making its determination is thusly discredited. The facts established by [P.G.] fall drastically short of those cases in which *in loco parentis* has been upheld, and, as such, he does not have standing for custody.

Trial Court Opinion, 11/9/20, at 14–16.

---

off of me and him throwing me in the tub washing me off."). Mother's counsel objected based on relevance, and the trial court sustained the objection. ***Id.*** at 31–32.

We discern no error in the trial court's conclusion. The trial court found Mother to be more credible than P.G. and accepted Mother's characterization of P.G. as merely a babysitter or part-time caretaker, a status which does not entitle him to *in-loco-parentis* standing. **See Argenio**, 703 A.2d at 1044; **Morgan**, 923 A.2d at 1188. The trial court was aware of the evidence P.G. cites in his brief, including Mother's text messages demanding that he retrieve Child from her care. However, the trial court did not interpret Mother's text messages as P.G. advocated nor accord them controlling weight. It was within the court's discretion to assess the credibility of the witnesses and weigh the evidence, and the court's findings in this regard do not warrant reversal of its order. **V.B. v. J.E.B.**, 55 A.3d 1193, 1197 (Pa. Super. 2012).

Moreover, we find meritless P.G.'s claim that the trial court improperly failed to consider the bond he shares with Child. Our Supreme Court rejected a similar claim in **C.G. v. J.H.**, 193 A.3d 891 (Pa. 2018). There, the appellant contended that she attained *in-loco-parentis* standing based on the bond she had established with her former partner's child. **Id.** at 907. Our Supreme Court concluded that this contention did not entitle the appellant to relief and explained that, while "it is a concern to the courts whether a child has developed strong psychological bonds, . . . such bonds must necessarily be based on the assumption of parental status and discharge of parental duties in order to achieve [*in-loco-parentis*] status." **Id.** at 910. The **C.G.** Court observed that giving determinative weight to the existence of a bond would undermine well established *in-loco-parentis* principles, such as the rule that

an individual may not attain such standing contrary to the wishes of a parent. *Id.* Thus, in the case *sub judice*, P.G.'s bond with Child does not overcome his status as a babysitter or part-time caretaker and does not confer *in-loco-parentis* standing.

Based on the foregoing analysis, we conclude that the trial court did not commit an error of law by granting Mother's preliminary objections and concluding that P.G. lacked *in-loco-parentis* standing with respect to Child. We therefore affirm the trial court's August 21, 2020 order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/23/2021